UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

IN RE:

CHARLES L. LETT, SR.                           Case No. 04-11858

      Debtor

# ORDER SETTING A FURTHER HEARING ON OCTOBER 5, 2006, REGARDING THE EXAMINER'S MOTION FOR APPROVAL OF REJECTION OF UNEXPIRED LEASES

    Collins Pettaway, Jr., Attorney for Debtor, Selma, AL
    Jeffery J. Hartley, Attorney for Examiner, Mobile, AL
    Max. A. Moseley & Richard J. Brockman, Attorneys for Ball Healthcare-Dallas, L.L.C., Birmingham, AL
    John C. Calame, Attorney for The Peoples Bank and Trust Company, Selma, AL
    Robert H. Turner, Attorney for Johnny Crear, Marion, AL
    Robert P. Reynolds, Attorney for Regions Bank, Tuscaloosa, AL

This matter came before the Court on the Examiner's motion for approval of rejection of an unexpired lease. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court has authority to enter a final order. For the reasons indicated below, the Court is setting a further hearing on the projected maintenance costs the Debtor would incur without rejection on **October 5, 2006, at 10:30 a.m.** on the video docket to be held that day.

## FACTS

On February 8, 1988, Charles L. Lett ("Debtor") and Samuel C. Lett entered into a real estate lease ("Master Lease") with Crear, Incorporated ("Corporation"). Samuel Lett

subsequently transferred his interest in the lease to the Debtor as part of a restructuring of their financial dealings.

Under the lease, the Corporation was given the right to occupy and make use of the Lighthouse Convalescent Home for a period of 5 years at a monthly rent of $6,200. The Corporation also had the option to renew the lease two more times for additional 5 year terms. Section 6 of the Master Lease provided that Lett "covenants with [the Corporation] to keep [the Corporation] in quiet possession of the leased premises during the term of this Lease Contract, or any renewal hereof, upon payment of rent and performance of all the terms of this lease." Section 13 of the Master Lease provided that "the repair of the roof, exterior walls, structural components of the building, underground water and sewer pipes, and the heating and air conditioning systems" are the responsibility of Lett "to repair and replace in a workmanlike manner."

On July 12, 1995, Lett and the Corporation executed a First Amendment to the Master Lease, extending the lease term for 20 years from the date of execution of the amendment. The lease was given as collateral to The Peoples Bank and Trust Company ("Peoples Bank") under section 11 of the First Amendment for an indebtedness that is now in excess of $1 million. Section 11 of the First Amendment provided

> [T]he parties expressly recognize that The Peoples Bank and Trust Company ... holds, in addition to other security, mortgages on the leased property, and that the interests of the parties in and to this lease have been assigned to Peoples Bank as additional security for the loans secured by said mortgages. Contemporaneously with the execution of this amended lease, Peoples Bank has agreed to loan to [the Debtor] additional amounts for the acquisition of property, construction of new beds, and acquisition by [the Debtor] of the rights of Dr. Samuel C. Lett, which loan is to be secured by the presently existing mortgages....

Section 12 of the First Amendment noted that the Master Lease still controlled in all other respects.

On April 12, 1999, a Second Amendment to the Master Lease was executed. Under the Second Amendment, the lease term was extended to June 30, 2019. The monthly rent was $11,800 until July 1, 2015, on which date rent would increase to a monthly rate of $13,800. Section 3 added a section 14 to the Master Lease, which provided that the Corporation "shall have the right to assign or sublet the Lease to Clarence M. Ball, Jr. or an entity that is controlled, directly or indirectly, by Clarence M. Ball. Jr." Section 4 of the Second Amendment provided that in all other respects, the Master Lease, "as amended by the First Amendment, shall be in full force and effect...."

The Corporation subsequently assigned its rights under the Master Lease to Johnny Crear ("Crear"), the Corporation's sole shareholder, with the knowledge and consent of Lett. On May 28, 1999, Crear entered into a sublease commencement agreement for the Lighthouse Convalescent Home with Ball Healthcare-Dallas, L.L.C. ("Healthcare-Dallas"). Under section 9 of the agreement, Crear and Healthcare-Dallas agreed to a covenant not to compete. Under the covenant, Crear promised not to own or have any interest in a business similar to Healthcare-Dallas's in Dallas or Lowndes Counties, Alabama; engage in any act that would cause injury to Healthcare-Dallas's goodwill; or induce any employee of Healthcare-Dallas from leaving their employment with Healthcare-Dallas. The agreement further provided that should Crear breach or threaten to breach the covenant not to compete, this would "cause irreparable injury" to Healthcare-Dallas, thereby entitling Healthcare-Dallas "to an injunction restraining such breach or threatened breach [as well as] any other or additional remedy for such breach or threatened breach."

On June 30, 1999, Crear and Healthcare-Dallas entered into a sublease agreement. Under the sublease, Healthcare-Dallas agreed to be bound by the terms of the Master Lease and the First and Second Amendments to the Master Lease. Healthcare-Dallas owed a monthly rent of $16,800 until July 1, 2015, upon which date the monthly rent would increase to $18,800 until July 1, 2019. Crear testified that the additional $5,000 lease payment (the $16,800 Crear received from Healthcare-Dallas minus the $11,800 Crear paid to the Debtor) was in consideration of the covenant not to compete. However, the sublease does not so state.

Clarence M. Ball, Jr., the manager and principal of Healthcare-Dallas, testified that Healthcare-Dallas provided approximately $1.5 million in leasehold improvements to the Lighthouse Convalescent Home.[1] Some of these leasehold improvements, as testified to by Ball, included a new fire alarm, paint, 10 additional beds to the nursing home, new wiring, and a new kitchen.[2] To finance these improvements, Healthcare-Dallas entered into a leasehold mortgage with Regions Bank in the amount of $1 million. Thus, Regions Bank holds a leasehold mortgage and a security interest on the leasehold improvements. Ball testified that Healthcare-Dallas would be required to pay the mortgages on the property even if the Master Lease was rejected, rejection of the lease may put his professional license in jeopardy, and his company would want to stay in the premises, if possible, even if the Master Lease was rejected.

On April 1, 2000, the Debtor, Peoples Bank, Crear, Healthcare-Dallas, and Regions Bank entered into a non-disturbance agreement. Under this agreement

> Peoples [Bank, the Debtor], Crear and [Healthcare-Dallas] agree that (i) in the event of a default by [the Debtor] under the Prime

---

[1]Healthcare-Dallas did not clarify when these improvements were made.

[2]This is not an exclusive list of leasehold improvements made by Healthcare-Dallas on the Lighthouse Convalescent Home, as testified to by Ball.

> Mortgage (whether or not such default results in a foreclosure of the Prime Mortgage, or deed in lieu thereof) or (ii) in the event of a default by Crear under the Lease or (iii) in the event of a default by [Healthcare-Dallas] under the Sublease, the Leasehold Mortgage and the rights of Regions [Bank] and any other party claiming under Regions [Bank] whether by foreclosure, deed in lieu of foreclosure or otherwise, shall not be terminated, reduced or otherwise affected, and such Sublease shall remain in full force and effect, so long as [Healthcare-Dallas], Regions [Bank] or such other party continues to pay all rental due under the Sublease ... and otherwise performs the terms and conditions thereof to be performed by the lessee thereunder.

On March 26, 2004, the Debtor filed a voluntary Chapter 11 petition. The Court appointed an Examiner in this case to handle several specific issues due to the potential conflicts the issues raised for the Debtor. One of the issues for the Examiner, as this Court directed in its order on May 23, 2006, was "to examine the facts and circumstances of the various lease agreements involving the Lighthouse Nursing Home, and the valuation and appraisals of the Lighthouse Nursing Home." In an order dated June 20, 2006, this Court also authorized the Examiner "to file any and all motions and/or notices regarding the leases (and subleases) currently encumbering the Debtor's nursing home." On June 27, 2006, the Examiner filed a motion for approval of rejection of unexpired leases of the Debtor, i.e. the Debtor's lease with Crear. The Examiner claims that under 11 U.S.C. § 365(a) of the Bankruptcy Code, Lett's lease with Crear should be rejected because it is "burdensome and has no residual value for the Debtor, his creditors, or other parties in interest." The Examiner further states, however, that "the arrangement with [Healthcare-Dallas] is of benefit to the Debtor, his creditors and other parties in interest." As such, the Examiner notes that "[a]fter the entire Lease is rejected, it may be beneficial to the Debtor, his creditors and other parties in interest to enter into a new and direct lease with" Healthcare-Dallas. The Examiner also argued during this Court's September 7

hearing that rejection of the lease would allow the Debtor possibly to restructure his debt with Peoples Bank and/or give the Debtor the opportunity to sell the property.

All of the parties involved with the lease arrangement appeared and asserted positions in regard to the Examiner's motion. The Debtor filed a response to the Examiner's motion in which he took "no position on the action by the examiner as long as it does not frustrate the feasibility and success or performance of the plan or amended plan to be submitted."

Healthcare-Dallas objected to the Examiner's motion. Healthcare-Dallas asserts that the Examiner could not and did not satisfy his burden for rejection, i.e. the business judgment test, since the Examiner did not present evidence that the lease is burdensome and that rejection is in the best interests of all parties involved. Instead, Healthcare-Dallas asserted that "the Lease only requires the Debtor to provide the premises at the stated rent, which rent the Debtor receives[; therefore], there is no burden to the Debtor, and no business justification for rejection." Healthcare-Dallas further asserts that the Examiner's sole purpose for seeking rejection is to enter into a new lease with Healthcare-Dallas or another party at an increased rent, which is a purpose, as Healthcare-Dallas responds, that is "unavailable [to the Examiner] and contrary to the express provisions of" 11 U.S.C. § 365(h). According to Healthcare-Dallas, under 11 U.S.C. § 365(h), it would still have the option to maintain possession of the premises under the same terms and conditions as provided for in the Master Lease, such option being one that Healthcare-Dallas says it will exercise. Healthcare-Dallas asserts that "the only possible result from rejection of the lease is that the lessee may be entitled to offset payments owed under the lease on account of any damages incurred by the rejection of the lease[,]" which is a result that would not benefit the Debtor. Alternatively, should the Court approve the Examiner's motion, Healthcare-Dallas "requests the Court to enter an order defining the rights of the lessee Crear, and therefore

those of [Healthcare-Dallas], and providing [both of them] with all the protections" of 11 U.S.C. § 365(h).

Peoples Bank filed an objection to the Examiner's motion. Peoples Bank claims that the Debtor owed them $1,014,600 on the day the Debtor filed his Chapter 11 case. Peoples Bank asserts that this "indebtedness is secured by an Amended and Restated Mortgage, Security Agreement and Assignment of Rents and Leases", which is dated July 12, 1995. Peoples Bank argues that the lease is an "integral part of the security for the aforesaid indebtedness owed by the Debtor to Peoples Bank" since it is currently being directly paid from the "sublessor/sublessee". Therefore, Peoples Bank asserts that if the Court approves the Examiner's motion, its security interest in the lease will be "severely and negatively damaged", and it will not be adequately protected. As such, Peoples Bank advocates that the Examiner's motion be denied since the Examiner has failed to address adequate protection in regard to Peoples Bank's security interest. Peoples Bank notes that if the Examiner's motion is granted, "any subsequent lease would be required to be assigned to Peoples Bank as collateral for its loan, with all payments being paid to Peoples Bank under its secured creditor status, leaving nothing for the unsecured creditors." As such, Peoples Bank claims that rejection is not in its best interest unless it can be adequately protected.

Crear filed an objection to the Examiner's motion in which he claimed that "[t]he rejection of the lease will substantially injure the debtor, the secured and unsecured creditors, and [t]he rejection runs counter to 11 U.S.C. 365(h)(1)(A)."

Regions Bank, who holds a leasehold mortgage on the leased property, appeared at the hearing and objected to the Examiner's motion. Regions Bank had not been given notice of the

hearing in time to file a written objection. Regions Bank asserted that the non-disturbance agreement had to be honored.

**LAW**

The only issue before the Court is whether or not the Examiner may reject the unexpired lease between the Debtor and Crear under 11 U.S.C. § 365(a). Under 11 U.S.C. § 365, the trustee has the burden to decide whether or not to assume or reject an unexpired lease. *Georgia Ports Auth. v. Diamond Mfg. Co., Inc. (In re Diamond Mfg. Co., Inc.)*, 164 B.R. 189, 199 (Bankr. S.D. Ga. 1994). The trustee's decision is "subject to court approval and is reviewed under the traditional 'business judgment' standard." *Id. citing In re Gardinier, Inc.*, 831 F.2d 974, 975 n.2 (11th Cir. 1987). *See In re Prime Motor Inns*, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991) ("This Court accepts the prevailing view that the proper test for determining whether a Court should approve a debtor in possession's motion to reject an ordinary executory contract is the business judgment test."). Under the business judgment standard, "'it is enough, if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate.'" *In re Prime Motor Inns*, 124 B.R. at 381 *quoting In re Minges*, 602 F.2d 38, 43 (2d Cir. 1979). The Court may not substitute its judgment for that of the Examiner but instead must follow the Examiner's business judgment "unless that judgment is the product of bad faith, whim or caprice." *Id*.

In this case, the Examiner asserts that under 11 U.S.C. § 365(a) and his business judgment, rejection of the unexpired lease between the Debtor and Crear will benefit the estate. The Examiner asserts that the Debtor, without the Crear lease in the middle, could negotiate a new lease with Healthcare-Dallas for a higher monthly rent – at least in the amount of $16,800, which is the rent (or rent plus the covenant not to compete fee) Healthcare-Dallas is now paying to Crear.

In order to determine whether the Examiner's proposal is appropriate, the Court must review it against the backdrop of bankruptcy law. Under 11 U.S.C. § 365(g)(1), "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease ... if such contract or lease has not been assumed ... immediately before the date of the filing of the petition...." The power to reject is to be considered as a "power to breach"; therefore, rejection of an unexpired lease leads to a breach of the lease. *Eastover Bank For Savings v. Sowashee Venture (In re Austin Dev. Co.)*, 19 F.3d 1077, 1082 (5th Cir. 1994). Furthermore, 11 U.S.C. § 502(g) provides that a "claim arising from the rejection ... of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed ... the same as if such claim had arisen before the date of the filing of the petition."

Therefore, if the Court were to approve the Examiner's motion to reject the lease between the Debtor and Crear so that the estate could realize the $5,000 difference in monthly rent between the Debtor's lease with Crear and Crear's sublease with Healthcare-Dallas, the Debtor would be considered in breach of the lease agreement. *See In re Lee Rd. Partners*, 155 B.R. 55, 64 (Bankr. E.D.N.Y. 1993), *aff'd*, 169 B.R. 507 (E.D.N.Y. 1994) (finding the debtor did not satisfy the business judgment test where the debtor's only purpose for rejecting the lease was to oust the lessee/sublessor and re-lease the premises at a higher market rate). The breach that would result would open the Debtor to prepetition claims under 11 U.S.C. § 502(g). The damage flowing from rejection of the lease could affect (1) Crear, who is the lessee under the lease agreement with the Debtor; (2) Peoples Bank, who holds a mortgage on the property; (3) Healthcare-Dallas, who currently subleases the property from Crear; and (4) Regions Bank, who holds a leasehold mortgage and security interest on the leasehold improvements made by Healthcare-Dallas on the property. Depending on whether Healthcare-Dallas and Lett could

agree to a new lease, these damages could far exceed the presumable $5,000 in additional monthly rent the Examiner might obtain until June 30, 2019.

However, the exact amount of the damages that might result in prepetition claims against the Debtor is not clear. Crear's loss of his $5,000 per month would be a prepetition rejection damage claim that is certain in all events if he treated the lease as terminated. From its arguments and evidence presented at the hearing, Healthcare-Dallas would claim the value of its leasehold improvements and other business damages if it had to leave the premises. The exact amount of its claim is uncertain but probably large.

Peoples Bank would suffer no damages compensable under 11 U.S.C. § 502(g), but, without the Master Lease, and if Healthcare-Dallas did not stay, it would suffer a substantial erosion in its collateral and a loss of a loan repayment stream that would very negatively impact the Debtor. If Healthcare-Dallas remained in the premises under a renegotiated lease, Peoples Bank would be better off with more valuable collateral, the improved lease, and more cash flow for the Debtor that might be paid to it. Regions Bank would be in a position similar to Peoples Bank. If Healthcare-Dallas vacated the premises, it would be worse off; it would be relatively unharmed if the lease were renegotiated.

However, according to the testimony and arguments of counsel, Crear will not treat the lease as terminated if the Debtor rejects the lease. Crear will instead exercise his rights under 11 U.S.C. § 365(h), which provides

> (1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and–
>
> (i) if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made

> by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or
>
> > (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.
>
> (B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

Under 11 U.S.C. § 365(h)(1)(A)(ii), Crear is allowed to retain his rights under the lease. Ball testified at trial that Healthcare-Dallas will continue to occupy the premises if allowed to do so under the sublease agreement with Crear. Presumably, Crear would continue to assert his rights under the lease since he is receiving $5,000 a month from Healthcare-Dallas under a covenant not to compete or lease payment, and the continued right to receive such money depends on the vitality of the Master Lease. If Crear does elect to use 11 U.S.C. § 365(h), then, as Healthcare-Dallas asserts in its objection to the Examiner's motion, 11 U.S.C. § 365(h)(1)(B) allows Crear to offset any damages he incurs (as a result of the Debtor's nonperformance due to rejection of the lease) against rent owed to the Debtor. Crear would continue paying the Debtor $11,800 until July 1, 2015 (then $13,800 until the end of the lease in 2019) and deduct from the rent the costs of maintaining "the repair of the roof, exterior walls, structural components of the building,

underground water and sewer pipes, and the heating and air conditioning systems[,]" which would be Lett's responsibility under section 13 of the Master Lease if he did not reject the lease. In this scenario, the only benefit to the Debtor and the bankruptcy estate is the savings of the costs of continued maintenance of the facility.

Under these possible outcomes, the Court must weigh the benefit of rejection against the detriment and determine whether it would be a proper exercise of business judgment to reject the lease. The benefit to the Debtor in the event Crear terminates the lease is the possibility to negotiate with Healthcare-Dallas to obtain an additional $5,000 per month (or more) until June 30, 2019, which is approximately $765,000. This is a substantial sum. However, against that sum, the Court must weigh Crear's damages – the same $5,000 a month until June 30, 2019, or approximately $765,000. Nonetheless, that prepetition claim may not be worth a full $765,000 if the Debtor's plan, when confirmed, pays unsecured creditors less than 100% of their claims.

If it were clear that Crear would not exercise his rights under 11 U.S.C. § 365(h), the Court would conclude that the Examiner had met his burden because Ball testified that Healthcare-Dallas would likely stay if its lease was renegotiated on the same terms. However, Crear would be a fool to agree to terminate his lease under the facts of this case, and the Court knows Crear and his attorney are not fools. If the lease is rejected, Crear will exercise his 11 U.S.C. § 365(h) rights. He will collect his $5,000 per month until June 30, 2019, and stay in possession. Even if he has to pay facility maintenance costs, he will be better off than if he treated the lease as terminated. In that case, the only benefit to the Debtor is elimination of facility maintenance expenses through June 30, 2019. These savings were not quantified for the Court. If such costs are significant, the Court will conclude that the Examiner's burden of proof

has been met; if the costs are insignificant, the Court will conclude that the Examiner's burden of proof has not been met.

The Examiner also argued during this Court's September 7 hearing that rejection of the lease could allow the Debtor to restructure his debt with Peoples Bank and will give the Debtor the opportunity to conduct a Section 363 sale of the property. However, these possibilities, without more proof of their probability, are insufficient to allow rejection.

THEREFORE IT IS ORDERED AND ADJUDGED:

1. The Court will set a further hearing on the projected maintenance costs the Debtor would incur without rejection.

2. The hearing is set for **October 5, 2006, at 10:30 a.m.** on the video docket to be held that day.

Dated: September 21, 2006

*Margaret A. Mahoney*
MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE